

FILED
IN OPEN COURT

JAN 31 2023

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CONNOR PENNINGTON,<br><br>*Defendant.* | Case No. 1:22-CR-127-(1) |

## STATEMENT OF FACTS

The United States and the defendant, Connor Pennington, agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

1. Beginning in and around 2018 and continuing through in and around May 2022, within the Eastern District of Virginia, and elsewhere, the defendant (hereinafter, PENNINGTON), did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with John FISCHEL and others, both known and unknown, to commit money laundering, in violation of 18 U.S.C. § 1956(h). Specifically, the defendant and his co-conspirators, knowing that the property involved in financial transactions represented the proceeds of a conspiracy to distribute controlled substances, did knowingly conduct such financial transactions knowing that the transactions were designed in whole or in part

   a. To conceal and disguise the nature, location, source, ownership, and/or control of the proceeds of the specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

    b. To avoid a transaction reporting requirement under State or Federal law, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii).

2. The purpose and objective of this conspiracy was to unlawfully distribute marijuana, THC, and other marijuana-derived products, and to launder the resultant proceeds.

3. At all times relevant to the criminal indictment, PENNINGTON was the owner and Chief Executive Officer of JointVentures LLC ("JointVentures"), a company that openly sold recreational marijuana and marijuana-derived products in the greater Washington DC metropolitan area. JointVentures LLC was never licensed as a medical marijuana dispensary in Virginia, the District of Columbia, or anywhere else. A November 2018 filing with the D.C. Department of Consumer and Regulatory Affairs describes the business as being involved in "e-commerce sales of smoke shop accessories." This was not accurate.

4. As part of its operations, JointVentures—which also did business under the names "Joint Delivery" and "JD Flowers"—maintained a professionally designed website through which it facilitated sales orders for its marijuana products, to include raw leaf marijuana, preloaded THC vape cartridges, assorted marijuana edibles, THC wax products, and other items. The website allowed customers to create a profile through which they could place orders for various amounts of JointVentures's marijuana and marijuana-derived products.

5. JointVentures operated the distribution and delivery side of the enterprise out of two units of a residential apartment building located at 1125 12th Street NW, Washington DC 20005. JointVentures delivered its products to customers using delivery drivers or cyclists, similar to food delivery services like UberEats or DoorDash, and dealt primarily in cash. On multiple occasions, JointVentures delivery drivers were robbed while making deliveries on behalf of the company.

6. In and around 2018, John FISCHEL—who was a Certified Public Accountant—joined the conspiracy when he was hired on as the Chief Financial Officer of the enterprise. FISCHEL organized the finances of JointVentures and its affiliated entities, set up payroll for JointVentures employees, and managed the flow of the proceeds generated by the conspiracy. PENNINGTON and FISCHEL, as well as Roy WILLIAMS and PENNINGTON's brother HAYDEN Pennington, were technically employed by a separate entity called "CDP Holdings LLC."

7. With FISCHEL's assistance, PENNINGTON operated the businesses in the guise of several seemingly legitimate businesses. Aside from JointVentures and CDP Holdings LLC, these entities include Bulb Wellness, ReFresh Wellness, Sail Software, Rosslyn, and others. PENNINGTON controlled each of these entities and was aware, for the entire duration of the conspiracy, that all business funds were generated from the unlawful sale of marijuana and other THC products.

8. An internal JointVentures spreadsheet revealed a total of $1,477,389.90 in sales of marijuana and THC products for 2018 alone, and $326,598.65 in sales for just the first two months of 2019. Sales invoices from the conspiracy establish that in the first three quarters of 2021 alone, JointVentures generated at least $2,369,824.80 in proceeds from the sale of marijuana and THC products.

9. Part of Roy WILLIAMS's role in the enterprise was to facilitate the shipment of marijuana and marijuana-derived products from Colorado and California to supply JointVentures as well as PENNINGTON's wholesale marijuana sales outside of the company. PENNINGTON and WILLIAMS often discussed the various products that JointVentures offered, and the various suppliers from whom PENNINGTON purchased product. On or about September 18, 2021,

PENNINGTON texted WILLIAMS that his "goal" for JointVentures was to get the company back up to making $70,000 per week (at least $280,000 per month) in sales.

10. Generally, WILLIAMS mailed marijuana or THC products to PENNINGTON in the District of Columbia using parcel services such as USPS, UPS, and Federal Express. Many of these packages entered the Eastern District of Virginia through Dulles International Airport. For example, on or about October 20, 2021, PENNINGTON texted WILLIAMS asking, "Rosin [THC concentrate] go out last night?" WILLIAMS responded that he had vacuum-sealed the product the night before but needed money to pay for shipping. PENNINGTON sent WILLIAMS money to cover the cost of shipping the product, and then WILLIAMS shipped the THC concentrate to PENNINGTON's home address in the District of Columbia.

11. On a few occasions, WILLIAMS accepted bulk cash from PENNINGTON in the District of Columbia, which he would transport on his return flights to Colorado, secreted within his luggage. The cash was used to pay PENNINGTON's suppliers for the marijuana products. PENNINGTON also shipped cash to WILLIAMS in Colorado to pay for product. For example, on or about January 12, 2022, PENNINGTON texted WILLIAMS, "I'm going to send you a pelican [case] for those carts [vape cartridges]." WILLIAMS responded, "sounds good," and provided his address in Colorado.

12. PENNINGTON's other brother, SOLOMON Pennington, also worked for JointVentures, primarily at a warehouse in Hyattsville, Maryland, where the enterprise manufactured and stored THC vape cartridges. On or about April 28, 2021, SOLOMON and PENNINGTON went to the warehouse in Hyattsville to retrieve finished and packaged vape cartridges to sell through JointVentures. PENNINGTON loaded two large boxes of vape cartridges in his vehicle, and then departed the warehouse, followed by SOLOMON in his vehicle.

Shortly thereafter, the Maryland State Police pulled PENNINGTON over for a traffic infraction, and lawfully seized the two boxes of cartridges. The boxes were found to contain approximately 405 vape cartridges and 47 small white containers of THC wax. Approximately two months later, the JointVentures website depicted vape cartridges currently on offer for sale, for $50 per cartridge, that matched the ones seized from PENNINGTON and SOLOMON in April 2021.

13. SOLOMON also met with PENNINGTON's marijuana suppliers to pick up product and pay them. For example, on or about October 27, 2021, PENNINGTON texted SOLOMON, "[Supplier] will be there at 6 for that cash. Just run it down to her and she's going to give you a suitcase." When the supplier arrived, PENNINGTON texted SOLOMON, "She's out front in white Range Rover." SOLOMON replied, "I got it."

14. As another example, on or about December 11, 2021, PENNINGTON texted SOLOMON that the same supplier "is coming by to get [$15,000]. [$]9k in safe. Need [$]6k from today's sales. Can you handle[?]" When the supplier arrived, PENNINGTON texted SOLOMON, "She's there // Black bmw." SOLOMON replied, "Got it."

15. During the relevant period, the conspiracy operated bank accounts at several different financial institutions in the names of its various businesses, including JointVentures. For example, on or about July 24, 2018, FISCHEL opened a TD Bank account for Bulb Wellness at the TD Bank branch in Leesburg, Virginia. On August 28, 2019, PENNINGTON and FISCHEL opened a business checking account with Wells Fargo on behalf of JointVentures; the account application falsely listed "smoke shop cigarettes" as the description of the business. On October 25, 2020, FISCHEL opened accounts at Bank of America on behalf of CDP Holdings LLC. On May 18, 2021, PENNINGTON and FISCHEL opened a business checking account with Truist Bank in the District of Columbia on behalf of JointVentures. On the signature card for the account,

PENNINGTON signed as the "CEO" and FISCHEL signed as the "CFO." On October 26, 2021, PENNINGTON and FISCHEL opened a business checking account with Truist Bank in Sterling, Virginia on behalf of ReFresh Wellness.

16. Members the conspiracy used these accounts to deposit cash earned from the unlawful sale of marijuana/THC products. PENNINGTON directed members of the conspiracy, including FISCHEL, to use these accounts to pay the conspiracy's operating expenses—such as paying wholesalers for product, and purchasing packaging material and rent on their physical spaces—and conduct other transactions designed to disguise the location or source of the funds.

17. Several financial institutions closed accounts associated with JointVentures. In response, at some point during the existence of the conspiracy, PENNINGTON and FISCHEL directed JointVentures employees to deposit the case proceeds from the sales in increments of less than $10,000, in order to avoid scrutiny by the banks and to disguise the nature and source of cash they were depositing and transacting.

18. For example, during the month of June 2020, the following deposits were made into the TD Bank account ending in 7362 belonging to JointVentures LLC:

| Date | Amount | Location |
|---|---|---|
| 6/2/2020 | $5,000 | Tenleytown (Washington DC) |
| 6/10/2020 | $5,000 | Alexandria, Virginia |
| 6/11/2020 | $5,000 | Tenleytown (Washington DC) |
| 6/12/2020 | $6,000 | Falls Church, Virginia |
| 6/17/2020 | $6,000 | Alexandria, Virginia |
| 6/29/2020 | $9,000 | Alexandria, Virginia |

19. Altogether, these six deposits totaled $36,000 in cash. Also in June 2020, the TD Bank account ending in 7362 made seven outgoing wires to a BBVA account ending in 8473

belonging to CDP Holdings, LLC., for a total of $32,500. Each of these wires was also in amounts less than $10,000.

20. On June 1, 2021, FISCHEL emailed Daniel ENGLISH, another employee of JointVentures, copying PENNINGTON. In the email, FISCHEL set forth the cash deposit schedule for the conspiracy going forward. The schedule directed employees to deposit $3,000 in cash every Monday, Wednesday, and Friday into the JointVentures account at SunTrust Bank (now Truist). The schedule further directed employees to deposit $9,000 in the CDP Holdings account at Bank of America every Tuesday; $7,000 in the ReFresh Wellness account at Bank of America every Wednesday, and $6,250 in the Sail Software account at an unspecified financial institution. FISCHEL wrote in the email, "To the extent possible, I'd like to keep to this schedule. You'll notice that it's not more than 2 banks in any one day and not more than $9,000 for the week [per account]. I'm attempting to minimize the deposits into JV [JointVentures] in order to prolong the account." This schedule was set up with PENNINGTON's blessing, to avoid alerting the banks that the business was involved in the sale of illegal drugs.

21. PENNINGTON and FISCHEL were at all times aware that their business was not legal under federal, state, or local law. For example, on April 10, 2019, PENNINGTON emailed FISCHEL to say that PENNINGTON had traveled to Colorado to purchase 15 pounds of leaf marijuana for $1,600 per pound. In the email, PENNINGTON informed FISCHEL that the company would have to continue to ship bulk cash to pay for product, in increments of less than $10,000 at a time. PENNINGTON further stated, "we are not doing any sales to vendors in the white market and to be honest we probably won't be doing distribution anytime soon in the legal market."

22. As another example, on or about November 16, 2021, PENNINGTON texted FISCHEL about whether the company should be paying local D.C. taxes. PENNINGTON stated in relevant part, "But we aren't a legit business. That's what I'm saying. We are buying black market products and running a black market business. It just doesn't make sense to pay all these taxes. We get what a golden star[?]" PENNINGTON then continued, "We can't get lines of credit, we can't get investors. Like we aren't a legit business because what we do isn't a licensed legal business."

23. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

24. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

25. If the defendant breaches the plea agreement, then pursuant to the plea agreement, she waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: _____   By: _____
Katherine E. Rumbaugh
David A. Peters
Assistant United States Attorneys

Defendant's Stipulation and Signature

After consulting with my attorneys, I hereby stipulate that the above Statement of Facts is true and accurate, and that if the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 1/31/23

Connor Pennington

Defense Counsel's Signature

We are the attorneys for Defendant in this case, Connor Pennington. We have carefully reviewed the above Statement of Facts with him. To our knowledge, his decision to stipulate to these facts is informed and voluntary.

Date: 1/31/23

David Benowitz
Rammy Barbari
Counsel for the Defendant